SAMUEL CHASE *et al.*

*v.*

CHARLES E. CHENEY.

1. ECCLESIASTICAL TRIAL *of a clergyman—in the protestant episcopal church—of the commission appointing the presenters.* The appointment by the bishop, of three persons to investigate a charge against a clergyman,

and presentment make, may be made in such manner as he may choose,—the appointment need not be in writing, nor does the canon on that subject require any commission to be issued. So that an objection, where a commission, in form, was issued, that it recited that the information upon which the bishop acted, was "credible information," and thereby excluded the hypothesis that he exercised the power of appointment in any other mode, such as was prescribed by the canon, can not avail, as affecting the jurisdiction of the ecclesiastical court over the subject matter of the presentment.

2. In such case, the jurisdiction of the church court does not depend upon the source of the facts communicated to the bishop. Even though he should disregard the canons, and transcend the limits of his power in that regard, that could not be pleaded to the jurisdiction.

3. Same—*of the presentment—its sufficiency, and by whom to be determined.* The sufficiency of the presentment, when made, in respect to the specification of time, place and circumstance, will not be inquired into by the secular courts, but that must be determined by the spiritual court before which the cause is to be tried.

4. But if the secular courts had the power to determine the sufficiency of the presentment, they would not test its correctness by the strict rules of criminal pleading, but hold that if it is so plainly drawn that the nature of the offense may be understood, it would be sufficient.

5. Where the *gravamen* of the presentment was the omission of the words "regenerate" and "regeneration," in the ministration of the sacrament of infant baptism, as to time it was alleged the offense was committed "at divers times during the two years last past," and "at divers times during the six months last past." This was held sufficient in regard to the time laid. The allegation of the precise time was not essential.

6. Same—*as to limitation.* There is no limitation, in point of time, to the inquiry by a church court, as to offenses.

7. Same—*of the right of challenge by the accused.* The canon of the protestant episcopal church which authorizes the formation of an ecclesiastical tribunal, directs that the bishop shall furnish a list of eight presbyters to the accused, and he shall select not less than three nor more than five from this list, who shall constitute the court. To this extent, and this only, is the right of challenge allowed. The spiritual court will not be compelled to observe the rule of law as to challenge of jurors.

8. Same—*of the notice for trial.* It is too late to question the sufficiency of the notice for trial in such case, after the party has appeared in person and made no pretense that he had not had time to prepare for trial.

9. Same—*for what purpose the civil courts will interfere.* The civil courts will interfere with churches and religious associations, when rights of

property or civil rights are involved, but will not revise the decisions of such associations upon ecclesiastical matters, merely to ascertain their jurisdiction. The decisions of ecclesiastical courts are final as to what constitutes an offense against the discipline of the church.

10. So where a clergyman of the protestant episcopal church was charged with the offense of omitting the words "regenerate" and "regeneration," in the ministration of the sacrament of infant baptism, it was *held*, the secular courts would not inquire whether the alleged omission was an offense against the laws of the church. That was a question of ecclesiastical cognizance alone. The church should enact and construe its own laws, and enforce its own discipline, without the interference of the legal tribunals.

11. A rector of the protestant episcopal church has not such a vested right in his office—such a property in the right to preach, and in the salary and emoluments pertaining thereto—as will authorize the civil courts to interpose upon that ground to restrain an ecclesiastical court in his trial for an alleged offense against the canons and discipline of the church. The contract of employment and for his salary must be construed and enforced by reference to the canons, which form a part of it. If the minister be suspended or deposed for any ecclesiastical offense, his right to the salary and emoluments is gone.

12. SAME—*constitutional restriction upon the legislature and the courts.* The constitution of the State forbids any legislative or judicial interference with churches or voluntary religious associations, unless the rights of property, or civil rights, are involved in the controversy.

13. Mr. CHIEF JUSTICE LAWRENCE and Mr. JUSTICE SHELDON dissent from the view that, in the administration of ecclesiastical discipline, and where there is no other right of property involved than the loss of the clerical office or salary, as an incident to such discipline, a spiritual court is the exclusive judge of its own jurisdiction, under the laws or canons of the religious association to which it belongs, and its decision of that question is binding upon secular courts, and hold that such courts should examine the question of jurisdiction, without regard to the decision of the spiritual court itself, and if they find such tribunal has been organized in defiance of the laws of the association, and is exercising a merely usurped and arbitrary power, they should furnish such protection as the laws of the land will give.

WRIT OF ERROR to the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge, presiding.

This was a suit in chancery, instituted in the court below, by Charles E. Cheney, against Samuel Chase and others, to

enjoin the action of an ecclesiastical court, convened under the following circumstances: The Rev. Charles Edward Cheney, a clergyman of the protestant episcopal church, and rector of Christ church, in the city of Chicago, being charged with having committed certain offenses against the constitution and laws of the church, the following commission was issued by the Bishop of Illinois:

" To the Rev. George F. Cushman, D. D., rector of the church of the Redeemer, Princeton; Rev. Richard F. Sweet, B. D., rector of the church of the Epiphany, Chicago, and Hon. L. B. Otis, of Chicago, a commission appointed by the ecclesiastical authority of Illinois, and under the provisions of canon 20 of said diocese, in relation to charges against Charles E. Cheney, a rector of Christ church, Chicago, the bishop of Illinois, greeting:

" Having been credibly informed that the Rev. Charles E. Cheney, rector of Christ church, in the city of Chicago, had in substance stated that he could not conscientiously use the office in the Book of Common Prayer for the administration of public baptism to infants, and that, in consequence, and at divers times, he habitually had altered by omission or otherwise, that service in the public administration of baptism to infants, and especially in omitting the word 'regenerate,' or the word 'regeneration,' occurring in the said service, and that he assumed the right and privilege of thus altering the prescribed form of this sacrament, I called upon the Rev. Mr. Cheney at his residence, on Monday, May 31, last past, in the afternoon, and, finding him at home, had with him a full conversation on the whole subject. On my way to this interview, I called on the Rev. Edward Sullivan, M. A., rector of Trinity church, whom I knew to be a friend of Rev. Mr. Cheney, to ask him (Mr. S.) to accompany me and to be present during the intended interview. Rev. Mr. Sullivan was not at home, however, so that the interview was private to Mr. Cheney and myself.

" In the conversation which thus took place in the library of the parsonage, the Rev. Charles E. Cheney, aforesaid,

declared to me that the statement, which I repeated in substance, as having been made to me, was the fact, so far as it related to his (Mr. Cheney's) acts, feelings, and purposes; that he could not conscientiously use the office for the public baptism of infants as set forth in the Book of Common Prayer by the church ; that he habitually made changes in it to adapt it to his own conscientious scruples, and the apprehended injurious construction of portions of said service by his congregation ; that he omitted therefrom, and especially the words ' regenerate' and ' regeneration,' wherever either occurred, and that he should continue to do so.

" During a protracted interview, I made full effort, according to my ability, by explanation, argument, and appeal, to remove his scruples and to induce him to conform in the future to the worship of the church and the administration of the sacrament to which he, on ordination, and as a priest in this church, had solemnly and distinctly pronounced conformity.

" I set forth to him, as a godly admonition in my relation to him as a bishop, his bounden duty of obedience to authority, and warned him of the painful consequences of discipline which must follow ; but Mr. Cheney continued steadily in the same position—that he could not and would not use the services in question as prescribed.

"At the close it was agreed that Mr. Cheney should take a week—a suggestion coming from myself, and the limit of time being named by Mr. Cheney himself—for a deliberate consideration of the matter, with the assurance from me that I should feel it my imperative duty to take measures for his presentment and trial for thus violating his ordination vows and altering the prescribed services unless he should withdraw the determination he expressed, and give me sufficient assurance that he would hereafter conform to the appointed ritual of the church.

33—58TH ILL.

" At the expiration of the time, and on or about Thursday, June 10, I received from Mr. Cheney a note, of which the following is a correct copy :

"' CHRIST CHURCH, Charles E. Cheney, Rector, ⎱
June 10, 1869. ⎰

"'*Reverend and Dear Sir :* I regret that circumstances compelled me to delay, for a few hours, the answer which I promised to send you in one week from our conversation on Monday, the 31st ultimo. After most serious and prayerful deliberation, I can only say that I have been able to arrive at no other conclusion than that I expressed to you.

Very truly yours,

CHARLES EDWARD CHENEY.

"' To Rt. Rev. Henry J. Whitehouse.'"

" This note refers expressly to the decision received after the deliberation expressed in the conversation alluded to above, and it must be taken, therefore, to admit a change or alteration of the office for infant baptism, and an omission from the prescribed form, especially of the words ' regenerate ' and ' regeneration,' and the resolution to continue the same alterations and omissions, all personal appeal and official admonition from myself to the contrary notwithstanding. I, therefore, have reason to believe that the said Rev. Charles E. Cheney, rector of Christ church, Chicago, is under imputation of being guilty of offenses and misconduct for which he is liable to be tried, and that the interests of the church require an investigation.

" Therefore, in obedience to the provisions of canon 20, of the diocese of Illinois, I do hereby appoint you, as trusty and well beloved presbyters and laymen of my jurisdiction, George F. Cushman, D. D., rector of the church of the Redeemer, Princeton, Rev. Richard F. Sweet, B. D., rector of the church of the Epiphany, Chicago, and Hon. Lucius B. Otis, of Chicago, or a majority of the same, to examine the case, and if, in your opinion, there be sufficient grounds for a presentment, you shall present the said clergyman, said Rev. Charles E.

Cheney, to me, the bishop, that I may proceed to order a trial according to canonical provisions therefor.

Given under my hand and Episcopal seal, this 12th day of June, A. D., 1869, and the eighteenth of my consecration.

HENRY J. WHITEHOUSE, <em>Bishop of Illinois.</em>"

In pursuance of this commission a presentment was made, as follows:

"*To the Right Reverend, the Bishop of Illinois:*

"The undersigned, a commission appointed by the ecclesiastical authority of the diocese of Illinois, under the provisions of canon XX of said diocese, to examine the case of the Rev. Charles E. Cheney, a presbyter of said diocese, and rector of Christ church, in the city of Chicago, and diocese of Illinois, who is under the imputation of having been guilty of offenses and misconduct for which he is liable to be tried, having duly considered the evidence produced before us, and examined the case, and there being in our opinion sufficient grounds for presentment, and, acting under and according to the provisions of said canon, do hereby present the said Rev. Charles E. Cheney to you for trial, upon the following charges and specifications:

CHARGE I. Violation of article 8 of the constitution of the protestant episcopal church, which provides, in substance, that a Book of Common Prayer, administration of the sacraments, and other rites and ceremonies of the church, when established by the general convention, shall be used in the protestant episcopal church, in those dioceses which shall have adopted said constitution. No alteration shall be made in the Book of Common Prayer, or other offices of the church, unless the same shall be proposed in one general convention, and by a resolve thereof made known to the convention of every diocese, and adopted at the subsequent general convention. And it is averred, that the general convention of said church has established and set forth a Book of Common Prayer, administration of the sacraments, and other rites and ceremonies of the church, to wit: in the year A. D., 1789;

and it is also averred that the diocese of Illinois has acceded to and adopted the said constitution, to wit: more than thirty years prior to this date.

"*Specification* 1—In this, that the said Rev. Charles E. Cheney, a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago, in said diocese, at divers times during the two years last past, and while publicly officiating in conducting religious services in said church, did intentionally make alterations in the use of the Book of Common Prayer and offices therein set forth, contrary to the law and settled order of this church.

"*Specification* 2—In this, that the said Rev. Charles E. Cheney, a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago, in said diocese, at divers times during the two years last past, in the parish of Christ church, Chicago, in the administration of public baptism to infants, did intentionally omit to use the word 'regeneration,' and the word 'regenerate,' wherever either occurred in the office set forth for that purpose in the Book of Common Prayer, administration of the sacraments, and other rites and ceremonies of this church.

"*Specification* 3—In this, that the said Rev. Charles E. Cheney, a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago, in said diocese, at divers times during the two years last past, in the ministration of baptism to infants, in said church, did intentionally neglect and omit to use the office set forth and established by this church, in the Book of Common Prayer, in manner and form as the said office is set forth and established in said book ; but, on the contrary, did omit the word 'regenerate' therefrom, in one or more of the places where it occurs in said office.

"CHARGE II. Violation of his engagement to conform to the doctrines and worship of the protestant episcopal church, in the United States, contained in the declaration which was subscribed by him before, and as an absolute condition preliminary to, his ordination as a minister in said church, as

prescribed and set forth in article 7 of the constitution adopted in general convention of said church, and which declaration is as follows :    ' I do believe the Holy Scriptures of the Old and New Testament to be the word of God, and to contain all things necessary to salvation ; and I do solemnly engage to conform to the doctrines and worship of the protestant episcopal church in the United States.'

" *Specification* 1—In this, that the said Rev. Charles E. Cheney, a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago, in said diocese, at divers times during the two years last past, and while officiating as a minister in said church, did intentionally make material alterations and omissions in the use of the Book of Common Prayer, and offices therein set forth, in violation of his solemn engagement to conform to the doctrines and worship of the protestant episcopal church in the United States.

" *Specification* 2—In this, that the said Rev. Charles E. Cheney, a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago, in said diocese, at divers times during the six months last past, at the usual religious services held at said church, for the ministration of public baptism of infants, according to the office or order for the same, as set forth in the Book of Common Prayer, did purposely omit to read, say, or use the word ' regeneration ' and the word ' regenerate,' wherever either of said words occurred in said office or order, in violation of his solemn engagement to conform to the doctrines and worship of the protestant episcopal church in the United States.

" *Specification* 3—In this, that the said Rev. Charles E. Cheney, a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago, in said diocese, at divers times during the six months last past, while in the discharge of his official duties in the parish of Christ church, aforesaid, in the administration of the sacrament of baptism to infants, did intentionally omit to use the word ' regenerate ' in one or more of the places where said word occurs in

the office set forth for that purpose in the Book of Common Prayer; all of which is an unauthorized omission, and a violation of the solemn engagement to conform to the doctrines and worship of this church.

" CHARGE III. Violation of the solemn promise and vow made by him at his ordination, which was in substance as follows :

"'*Question by the Bishop*—' Will you, then, give your faithful diligence, always so to minister the doctrines and sacraments, and the discipline of Christ as the Lord hath commanded, and as this church hath received the same according to the commandments of God, so that you may teach the people committed to your care and charge with all diligence to keep and observe the same?'

" '*Answer*—' I will do so by the help of the Lord.'

" *Specification* 1—In this, that the Rev. Charles E. Cheney, a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago, in said diocese, at divers times during the 12 months last past, and while officiating in public religious services in said church, did purposely make material alterations and omissions in such services as set forth and established by this church in the book commonly called ' The Book of Common Prayer,' and in violation of the solemn ordination vow, that he would minister the doctrine, sacraments, and discipline as this church hath received the same.

" *Specification* 2—In this, that the Rev. Charles E. Cheney, a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago, in said diocese, at divers times during the two years last past, and while in the discharge of his official duties as such rector in said church, did intentionally administer the sacrament of baptism, in the case of infants, without using the word ' regenerate,' and the word ' regeneration,' as said words occur in the office set forth, and established by this church for ' the ministration of public baptism of infants,' all of which is in violation of his solemn ordination vow, that he would minister the sacraments as this

church hath received the same, and teach the people committed to his care and charge to keep and observe the same.

"*Specification* 3—In this, that the Rev. Charles E. Cheney, a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago, in said diocese, at divers times during the two years last past, in the church building belonging to said parish, did, in the ministration of baptism to infants, designedly omit to use the word 'regenerate' in one or more of the places where said word occurs in the office set forth by this church to be used on such occasions; all of which is in violation of his solemn ordination vow and promise that he would with all diligence teach the people committed to his care and charge the doctrines, sacraments and discipline of Christ as this church hath received the same.

"Dated at the city of Chicago, the 21st day of June, A. D., 1869.

"GEORGE F. CUSHMAN, D. D.,

*Rector of the church of the Redeemer, Princeton.*

"RICHARD F. SWEET, B. D.,

*Rector of the church of the Epiphany, Chicago.*

"L. B. OTIS."

And thereupon the following citation was issued:

"CHICAGO, DIOCESE OF ILLINOIS.

"*To the Rev. Charles Edward Cheney, rector of Christ church, Chicago:*

"The commission of three persons, two of whom are presbyters, whom I appointed, acting according to canon 20 of the diocese of Illinois, viz.:

"The Rev. George F. Cushman, D. D., rector of the church of the Redeemer, Princeton; the Rev. Richard F. Sweet, B. D., rector of the church of the Epiphany, Chicago; Hon. Lucius B. Otis, Chicago, to examine the offense and misconduct for which I consider you liable to be tried, and that the interest of the church requires an investigation—have found, in their opinion, sufficient grounds for a presentment, and have accordingly presented you for trial.

" I, therefore, the bishop of the diocese of Illinois, do herewith serve upon you a certified copy of said presentment, by the hands of Rev. John Harris Knowles, presbyter, canon of the cathedral, acting as my commissary for this purpose.

"And I do, by these presents, cite you, the Rev. Charles Edward Cheney, to appear and answer thereto before a court which shall be duly organized and convened, on Wednesday, July 21st next, in the chapel of the cathedral of Sts. Peter and Paul, on the corner of Washington and Peoria streets, in the city of Chicago, at 10 o'clock in the morning.

"And in pursuance with section 3 of canon 20 of the diocese of Illinois, I hereby furnish you a list of eight presbyters entitled to seats in the convention. From which list you shall select not less than three, nor more than five, who shall be assessors to try the facts in issue.

"And if within twelve days of the date of this notice and citation being served upon you, you shall fail by neglect or refusal to make such selection, and to notify me of the names of the presbyters thus chosen, then and in that event shall the standing committee select for you, and the presbyters thus selected shall be the assessors in the case, the same as if selected by yourself.

"*List of presbyters:* Rev. Cornelius T. Abbott, rector of St. Paul's church, Alton, and rural dean ; Rev. Thos. N. Benedict, minister of St. Luke's church, Wyoming, P. O., Robin's Nest ; Rev. John Benson, rector of St. John's church, Peoria ; Rev. Fred. W. Boyd, D. D., rector of Grace church, Galesburg ; Rev. Samuel Chase, D. D., rural dean, vice President Jubilee College, rector of Christ church, Robin's Nest ; Rev. Sidney Corbett, B. D., rector of St. John's church, Quincy, rural dean ; Rev. Henry N. Pierce, D. D., rector of St. Paul's church, Springfield, rural dean ; Rev. A. W. Snyder, rector of Calvary church, Chicago.

" Should you, the accused, desire any witness or witnesses to be summoned by such authority as the bishop may be able to

exert, I will issue suitable summons on being furnished with the name or names.

"Given under my hand and Episcopal seal, this 21st day of June, A. D., 1869 ; and in the eighteenth year of my consecration.

"HENRY J. WHITEHOUSE, *Bishop of Illinois.*"

To these various proceedings the respondent took exceptions, which are set forth in the two papers following :

"*Diocese of Illinois*—In the matter of the presentment of George F. Cushman, D. D., Richard F. Sweet, B. D., and L. B. Otis *vs.* Rev. Charles Edward Cheney.

" To the Rev. Samuel Chase, D. D., Rev. Thomas N. Benedict, Rev. John Benson, Rev. Henry N. Pierce, D. D., and Rev. A. W. Snyder—PROTEST AND OBJECTION :

" Charles Edward Cheney, the accused in the alleged presentment aforesaid, not admitting the charges and specifications in said alleged presentment contained are therein well and sufficiently stated and set forth, nor that the same or any or either of them are or is true, nor that the citation issued thereon is sufficient in form or substance :   Nevertheless, by way of objection and protest, says that cognizance of the said alleged presentment, and the charges and specifications, matters and things therein, can not be taken by Rev. Samuel Chase, D. D., Rev. Thomas N. Benedict, Rev.  John  Benson, Rev. Henry N. Pierce, D. D., and Rev. A. W. Snyder, who now and here appearing claim as a court so to do, upon the grounds severally assigned following, to wit :

"*First.* Because eight presbyters canonically qualified to act as assessors in the premises have not presented themselves, and are not present at this, the return day of the citation issued herein, at the time and place therein specified for the selection therefrom by the accused of not less than three nor more than five, to act as assessors as aforesaid.

"*Second.* Because the said, the Rev. Samuel Chase, D. D., Rev. Henry N. Pierce, D. D., Rev. Thomas N. Benedict, Rev. John Benson, and Rev. A.W. Snyder, decline to be examined by,

or on behalf of, the accused touching their qualifications to sit as assessors constituting the court for the trial of the presentment herein, in respect to the formation or expression by either of them of an opinion as to the guilt or innocence of the accused in the premises.

"*Third.* Because the said, the Rev. A. W. Snyder has formed and expressed the opinion that the accused is guilty in the premises, and he is therefore incompetent to sit as an assessor on the trial of said alleged presentment.

"*Fourth.* Because no list of eight presbyters qualified to sit upon the trial of said presentment has been furnished to accused, out of which to select assessors, as by canon provided.

"For which said several reasons, one or some of them, the accused insists that the said, the Rev. Samuel Chase, D. D., Rev. Thomas N. Benedict, Rev. John Benson, Rev. Henry N. Pierce, D. D., and Rev. A. W. Snyder, ought not to act as assessors constituting a court in the premises, and can not lawfully proceed so to do.

CHARLES EDWARD CHENEY.

"*Diocese of Illinois*—In the matter of the presentment of George F. Cushman, D. D., Richard F. Sweet, B. D., and L. B. Otis, *vs.* Charles Edward Cheney.

"*To the Rev. Samuel Chase, D. D., Rev. John Benson, Rev. Henry N. Pierce, D. D., Rev Thomas N. Benedict, and Rev. A. W. Snyder, assessors.*

"The exceptions of Charles Edward Cheney, presbyter of said diocese, and rector of Christ church, in the city of Chicago, in said diocese, to the alleged presentment by Rev. George F. Cushman, D. D., Rev. Richard F. Sweet, B. D., and L. B. Otis, and to the citation issued thereon, allege that the said assessors ought not to take cognizance of the said alleged presentment, and the charges and specifications therein contained, and that the same and the citation issued thereon, should be quashed, for the reasons and upon the grounds following, to wit:

"*First exception*—That in and by the said citation, it is declared by the bishop of this diocese, under his hand and

Episcopal seal, that the Rev. George E. Cushman, D. D., the Rev. Richard F. Sweet, B. D., and Hon. L. B. Otis, were appointed by said bishop a commission to examine the offense and misconduct for which the said bishop considered this respondent liable to be tried, and that the interests of the church required an investigation, and that said alleged presentment was found by the said three persons so appointed a commission accordingly : Wherefore, it appears from the citation aforesaid, that the appointment of said three persons as a commission as aforesaid, was invalid and void, as also was the alleged presentment aforesaid so by such illegal and void commission pretended to be found.

" *Second exception*—That the bishop of this diocese at the time of his appointing the alleged presbyters by whom the said alleged presentment was found, did not have reason to believe on information given by a major part in number of the vestry of said Christ church, or by any three presbyters of this diocese entitled to seats in the convention of this diocese, or from ' public rumor as contemplated by section 2, of canon 37,' of the general convention, that this respondent was under imputation of having been guilty of any offense or misconduct for which he was liable to trial, and that the interests of the church required an investigation.

" *Third exception*—That this respondent was not, at the time of the appointment of the said alleged presenters, or at the time of the finding of said alleged presentment, under imputation of having been guilty of any offense or misconduct for which he was liable to trial.

"*Fourth exception*—That in and by said alleged presentment it does not affirmatively appear that the presenters thereof were appointed, and said alleged presentment thereby authorized (if cause existed), to be found because the bishop of the diocese aforesaid had reason to believe when he appointed said presenters on information given by a major part in numbers of the vestry of the church of which the accused now is, and

then was, rector, or by any three presbyters of the diocese entitled to seats in the convention of this diocese, or from 'public rumor, as contemplated by section 2, of canon 37,' of the general convention, that the respondent was under imputation of having been guilty of any offense or misconduct for which he was liable for trial.

"*Fifth exception*—That the respondent is not charged in and by said alleged presentment or either of the charges and specifications therein contained, with any offense or misconduct, for which he is liable to be tried under the canons of the general convention and of the diocese of Illinois.

"CHARLES EDWARD CHENEY."

To the charges and specifications contained in the presentment, the respondent also filed the following exceptions:

"*Diocese of Illinois.*—In the matter of the presentment of George F. Cushman, D. D., Richard F. Sweet, B. D., and L. B. Otis *vs.* Rev. Charles Edward Cheney.

"*To the Rev. the Assessors.*—In the exceptions of Charles Edward Cheney, presbyter of said diocese, and rector of Christ church, in the city of Chicago, in said diocese, to the presentment of Rev. George F. Cushman, D. D., Rev. Richard F. Sweet, B. D., and Hon. L. B. Otis, said respondent, hereby expressly reserving his rights under the exceptions heretofore taken to the jurisdiction of this court, alleges that the said presentment and the charges and specifications therein contained are informal and insufficient in this:

"FIRST EXCEPTION—That charge one of said alleged presentment and the specifications thereunder are insufficient, as is each of said specifications, in this:

"*First.* That it does not appear from specification one of said charge what alterations the respondent is therein alleged to have intentionally made in the use of the Book of Common Prayer, and offices therein set forth, nor is it therein averred with reasonable certainty, at what time nor under what circumstances such alterations, if any, were made.

"*Second.* That specification two of said charge does not aver with reasonable certainty at what time or times the respondent omitted to use the word 'regeneration,' and the word 'regenerate,' as therein alleged, nor under what circumstances.

"*Third.* That specification three of said charge does not aver with reasonable certainty at what time nor under what circumstances the said respondent did intentionally neglect and 'omit to use the office set forth in the Book of Common Prayer in manner and form as the said office is set forth, and established in said book,' as alleged therein, nor does it aver with reasonable certainty at what time nor under what circumstances the said respondent omitted the word 'regenerate' from said office as alleged.

"SECOND EXCEPTION—That charge two, of the presentment, and the specification, thereunder, are insufficient, as is each of said specifications, in this:

"*First.* That specification one, of said charge, does not specify what material alterations and omissions in the use of the Book of Common Prayer and offices therein set forth this respondent is charged with having made, nor does it set forth with reasonable precision at what time or under what circumstances such alleged alterations or omissions were made.

"*Second.* That specification two of said charge does not specify with reasonable certainty the time when or the circumstances under which this respondent did purposely omit to read, say, or use the word 'regenerate' or the word 'regeneration' wherever either of said words occurred in said office or order for the ministration of public baptism of infants, as alleged in this specification.

"*Third.* That specification three of said charge does not specify with reasonable certainty the time when nor the circumstances under which the word 'regenerate' is alleged in this specification to have been omitted by this respondent in the administration of the sacrament of baptism to infants, in one or more of the places where said word occurs, in the office set forth for that purpose in the Book of Common Prayer.

" THIRD EXCEPTION—That charge three of said presentment, and the specifications, thereunder, are insufficient, as is each of said specifications, in this:

"*First.* That specification one, of said charge, does not set forth what material alterations and omissions this respondent, while officiating in public religious services in Christ church, purposely made in such services as set forth and established in this church in the book commonly called the Book of Common Prayer, as alleged in said specifications, nor does it specify with reasonable certainty at what time nor under what circumstances such alleged alterations and omissions were made.

"*Second.* That specification two, of said charge, does not specify with reasonable certainty at what time nor under what circumstances this respondent did, as is alleged in said specification, in Christ church, .in the city of Chicago, in said diocese, intentionally administer the sacrament of baptism in the case of infants without using the word ' regenerate' and the word ' regeneration,' as said words occur in the office set forth and established by this church for the ' ministration of public baptism of infants.'

" *Third.* That specification three, of said charge, does not specify with reasonable certainty when this respondent did, in the ministration of baptism to infants, designedly omit to use the word ' regenerate' in one or more of the places where said word occurs in the office set forth by this church to be used on such occasions, as alleged in said specification.

" FOURTH EXCEPTION—That said presentment is informal and insufficient in this, that the charges therein contained, and the specifications of each of the said charges, do not, nor does either of them, specify with reasonable certainty as to time, place, and circumstances, the alleged offense and misconduct with which the respondent is attempted to be charged therein.

" FIFTH EXCEPTION—That the said charges one, two, and three do not, nor does either of them, set forth any offense or misconduct for which this respondent is liable for trial.

"CHARLES EDWARD CHENEY."

All the exceptions and objections of the respondent were overruled in the ecclesiastical court, and pending those proceedings the Superior Court of Chicago, upon bill filed by Charles E. Cheney, awarded an injunction, restraining the ecclesiastical court from proceeding further in the matter of that trial, until the further order of the Superior Court. The grounds upon which the injunction was asked, are set forth in the opinion of this court.

Subsequently a motion to dissolve the injunction was overruled, and thereupon a decree *pro forma* was entered, in favor of the complainant.

The defendants sued out this writ of error.

Mr. WILLIAM C. GOUDY and Mr. S. CORNING JUDD, for the plaintiffs in error.

Mr. MELVILLE W. FULLER, for the defendant in error.

Mr. JUSTICE THORNTON delivered the opinion of the Court:

This is a bill to enjoin plaintiffs in error, as an ecclesiastical court, from proceeding with the trial of the defendant, for alleged offenses and misconduct, as a presbyter of the diocese of Illinois, and rector of Christ church, in the city of Chicago.

The injunction was originally granted, without notice; and a motion was then made to dissolve it, which, upon the hearing, on bill, answer, replication and affidavits, was overruled. The case is before us by writ of error.

The bill alleges the issuing of a commission, by the bishop of the diocese, appointing three persons as presenters; the finding of the presentment ; and a citation, giving notice of the time and place of trial; that the accused, in person, and by counsel, appeared when the court was organized, and preferred objections to the validity of all the papers, which were overruled, and claimed his right of challenge of the persons who were selected to try the issue, which was denied;

that the commission, presentment and citation are void, and give no authority to the assessors; that the accused receives, from his parish, forty-five hundred dollars per annum, and enjoys a rectory, rent free, and has received numerous calls from other parishes, in other dioceses, at much higher salaries; that he has not been guilty of any offense for which he is liable to be tried, and yet the bishop is prejudiced against him; has prejudged his case; and is determined to convict and deprive him of his position and its emoluments; that the respondents were selected to condemn; they sympathise with the bishop, and, with him, belong to the high church party; and that complainant is attached to the low church party, in the protestant episcopal church; and he and the bishop are diametrically opposed in their views.

There are numerous affidavits filed, which we shall not consider, in the view we take of this case.

The charge of prejudice and combination is denied, by the answers; and the only proof to sustain it, worthy of any consideration, is in the affidavit of the accused.

A stipulation was entered into and made a part of the record, that the printed constitution and canons of the diocese of Illinois, and of the general convention of the protestant episcopal church; the address of the bishop of Illinois, to the diocesan convention of 1863, and his answer and letter, in the case of the Rev. E. W. Hagar, should be evidence in the case.

Without asserting the power of this court, in cases of this character, yet, on account of the earnest and able and elaborate argument of counsel, we will notice the objection that the spiritual court had no authority to adjudicate upon the alleged offense.

The objections are these:

*First.* The bishop, by a recital in the commission that the information upon which he acted was " credible information," excludes the hypothesis that he exercised the power of appointment, in either of the three modes mentioned in sec.

2 of canon 20; and that he could only proceed as directed therein.

*Second.* That the presentment was insufficient, in specification of time, place and circumstance.

*Third.* That eight presbyters did not appear, but only five, at the time and place of trial, when the attempted organization of the court took place; and that the accused was denied his right of challenge.

*Fourth.* That there was, in fact, no notice given of the trial.

Except one, these objections are extremely technical.

There is in evidence a commission, issued by the bishop, appointing three persons to investigate the charge, and make presentment. Presentment was found, containing three charges and divers specifications, as to offenses committed while officiating as rector of Christ church, in Chicago. A citation was signed by the bishop, fixing the time and place of trial, which, with a copy of the presentment, was duly served. The citation furnished the names of eight presbyters, from whom the accused might select five or three, as assessors; and allowed twelve days in which to make the selection.

Was a commission necessary to confer jurisdiction? Did the court or the accused have any right to call for it? Concede that the bishop did not obtain his information from either of the sources specified in the canon, is the jurisdiction of the court thereby ousted? The canon requires no commission to be issued. By the canon, the appointment need not be in writing. The bishop is compelled to appoint three persons, to examine the case, and presentment make. He performs this duty in such manner as he may choose.

If the court had jurisdiction of the subject matter and the person, it had power to proceed. The subject matter was contained in the presentment, not in the commission. The person had been summoned and was present. Therefore neither the source, nor the character, of the facts communicated to the bishop, except as contained in the presentment, were proper

34—58th Ill.

subjects of inquiry by the church court. The offense charged was the matter to be investigated—the fact to be tried. If the accused had violated the constitution of his church; his engagement to conform to its doctrines and worship; and his ordination vow, as alleged, such violations could not be palliated by the errors of the bishop. If the bishop disregarded the canons, and transcended the limits of his power, as diocesan, he is amenable therefor, and liable to trial, before his brother bishops. His transgression can not excuse the wrongful act of another; can not be pleaded in justification, or to the jurisdiction. The court, then, upon presentment made and due service, had power to take cognizance of, and decide the case.

This view is sustained by a careful examination of the canon. Section 1 of canon 20, in prescribing the duties of the·presenters, says, "if there be, in their opinion, sufficient grounds for a presentment, they shall present such clergyman to the bishop; who shall thereupon cause a copy of said presentment, together with a citation to appear and answer thereto, to be served upon the accused, with all convenient speed." Section 7, of the same canon, in reference to the duties of the presbyters who may compose the court, says, "they shall declare, in a writing to be signed by them, or a majority of them, their verdict on the several charges and specifications contained in the presentment." It will be seen that the accused is entitled to a copy of the presentment, not the commission, and to a citation. The court act alone on the presentment, and the evidence adduced.

Sustaining, as we do, the jurisdiction of the ecclesiastical court, we might fairly waive any answer to the suggested defects in the presentment, and rely upon an authority furnished by counsel: *Walker* v. *Wainright*, 16 Barb. S. C. R. 486. In that case the motion was made by the counsel for Walker, that Wainwright, the bishop, be required to show cause why the injunction previously granted, restraining the sentence, in accordance with the verdict of an ecclesiastical

court, should not be made absolute. The learned judge said : " The only cognizance which the court will take of the case, is to inquire whether there is a want of jurisdiction in the defendant, to do the act which is sought to be restrained. I can not consent to review the exercise of any discretion on his part, or inquire whether his judgment, or that of the subordinate ecclesiastical tribunal, can be justified by the truth of the case. I can not draw to myself the duty of revising their action, or of canvassing its manner or foundation, any further than to inquire whether, according to the law of the association to which both of the parties belong, they had authority to act at all. In other words, I can inquire only, whether the defendant has the power to act, and not whether he is acting rightly.   *   *   *   *   The refusal of the defendant to issue a commission to take testimony, his refusal to grant a new trial, the alleged misconduct of one of the court, are all matters which relate to the mode of procedure, and not to the right to proceed ; and I repeat, that it is the latter alone that I can take cognizance of." The motion was denied, and the injunction dissolved.

If we had the right to determine the sufficiency of the presentment, we should hold, as this court has held in numerous decisions, in criminal cases, that it is sufficient, if so plainly drawn that the nature of the offense may be understood. We should not test its correctness by the strict rules of criminal pleading.

The accused was informed by the presentment, that in his own church, in the city of Chicago, he had committed the alleged offenses. The language is explicit as to their character. The omissions and alterations are plainly set forth. The place is definitely fixed. No particular day is averred. Was this necessary? The offenses charged are mostly omissions. The rule is, "Where the offense consisted of an omission, it is not necessary to allege any time to it." 2 Hawk. C. 25, S. 79. Even in criminal cases, it is not necessary to prove the time precisely, as laid. The particular day is not material in

point of proof, and is merely matter of form.    Philips Ev. Vol. 1, 214. . This court has decided, that the allegation of the precise time, even in criminal cases, is not essential, unless in a few cases.    *Gebhart* v. *Adams,* 23 Ill. 399.    The presentment avers, as to time, " at divers times during the two years last past," and " at divers times during the six months last past."    It was insisted, in the argument, that, as no precise day is named, therefore the accused can not meet the charge, without summoning a large number of witnesses.    He would not be aided by the averment of a particular day.    If the presentment had charged the commission of the offense, on a certain day, in the month of June, A. D., 1867, the prosecution would not, by any rule of law, have been limited to the day named, but might have proved the offense—the omission— on any day between the day named and the date of the presentment.    The statute of limitations would not apply, for the canon has not so provided.    The highest judicature, in this church, has decided that there .is no such law governing church trials.    Bishop Onderdonk was found guilty of immorality and impurity, committed seven years prior to his trial; and the bishops of Louisiana, Rhode Island, Delaware, and Arkansas, in their opinion, declared that there was no limitation to the inquiry by a church court, as to offenses, because none had been fixed and recognized by the canons.

It is inconceivable that the accused could have been surprised by any vagueness or uncertainty in the charges and specifications.    It is a reasonable presumption, that a minister has knowledge of the constitution of his church, and of his acts as such minister, of a public character, and within a recent period; and particularly his conduct and omissions in the administration of the sacraments of his church.    The bill contains a virtual admission of such knowledge.    The *gravamen,* in the presentment, is the omission of the words " regenerate " and " regeneration," in the ministration of the sacrament of infant baptism.    The bill has no positive negation of the omission, but merely avers, " that your orator does

not believe himself to have been guilty of offense and miscon-
duct, rendering him liable to trial." The fair construction of
this averment is: " I am guilty of the omission; but this is
no offense which renders me liable to trial." In his affidavit,
in support of the bill, the accused said he had informed the
bishop, that "he had conscientious scruples in regard to the
positive averment of the regeneration of the baptized infant,
by virtue of the act of baptism only." He further stated,
"but this affiant utterly denies, that the omission of the word
'regenerate,' from some part of the said office for infant bapt-
ism, would constitute any offense under the canons, etc." The
inference is irresistible, that he was informed of the nature
and cause of the accusation against him.

The third objection raises the right of challenge, and it is
insisted that this right inheres in every citizen ; that the com-
mon law and common justice give it. This is true, in trials
in all courts organized under the constitution and laws of the
land. This spiritual court was not thus created. It is the
creature of the canons of the church, and by them must be
governed, and by them be judged. Why should we force
upon this church judicatory our system, without the asking
and against its consent ?

The canons must control. Section 3 of canon 20 authorizes
the formation of an ecclesiastical tribunal, and directs that the
bishop shall furnish a list of eight presbyters, to the accused,
and he shall select not less than three nor more than five from
this list, who shall constitute the court; but if he neglect or
refuse to make a selection, the standing committee shall select
for him. This is the mode adopted, and, by implication,
excludes all other modes. Eight persons are presented, three
or five might be rejected, without cause, and to this extent a
peremptory challenge is allowed.

The minister, in a legal point of view, is a voluntary mem-
ber of the association to which he belongs. The position is
not forced upon him, he seeks it. He accepts it, with all its
burdens and consequences; with all the rules and laws, and

canons then subsisting, or to be made by competent author-
ity ; and can, at pleasure and with impunity, abandon it.   If
they were merciful and regardful of conscientious scruples, he
knew it ; if they were arbitrary, illiberal, and attempted to
chain the thoughts and consciences, he knew it.   They can
not, in any event, endanger his life or liberty ; impair any of
his personal rights ; deprive him of property acquired under
the laws ; or interfere with the free exercise and enjoyment of
religious profession and worship, for these are protected by
the constitution and laws.   While a member of the asso-
ciation, however, and having a full share in all the benefits
resulting therefrom, he should adhere to its discipline ; con-
form to its doctrines and mode of worship, and obey its laws
and canons.   If reason and conscience will not permit, the
connection should be severed.   " The only remedy which the
member of a voluntary association has, when he is dissatisfied
with the proceedings of the body with which  he is connected,
is to withdraw from it."   *Forbes v. Eden, (infra.)*

If we compel this spiritual court to observe the rule of law,
as to challenge of jurors, it would be our duty to enforce the
observance of all the rules of law, unless of impossible appli-
cation.   With the same propriety it might be urged, that
twelve presbyters—the number of a jury—instead of three or
five, should form the court.   Why not go beyond the pale of
the church, and abandon the presbyters, as wholly incom-
petent ?   The canon, in the designation of presbyters, as
assessors, and the number, is no more emphatic than in pro-
viding the manner of selection.   What law shall govern, as to
the number  of witnesses necessary to establish an  offense ?
Our law only requires one witness, with two exceptions ; the
scriptural rule requires two.   The injunction of St. Paul is :
" Against an elder receive not an accusation, but before two or
three witnesses."   The law, under the old dispensation, was,
" One witness shall not rise up against a man for any iniquity,
or for any sin ; at the mouth of two witnesses, or at the mouth
of three witnesses, shall the matter be established."

We have no right, and, therefore, will not exercise the power, to dictate ecclesiastical law. We do not aspire to become *de facto* heads of the church, and, by construction or otherwise, abrogate its laws and canons. We shall not inquire whether the alleged omission is any offense. This is a question of ecclesiastical cognizance. This is no forum for such adjudication. The church should guard its own fold; enact and construe its own laws; enforce its own discipline; and thus will be maintained the boundary between the temporal and spiritual power.

As to the fourth objection, that the notice for trial was insufficient, we have only to say, this comes too late. The party was present, and made no pretense that he had not had time to prepare for trial. As an allegation in the bill, it is too frivolous to be considered.

But it is said, that the civil rights of the Rev. Mr. Cheney are involved in this controversy; that the office of a clergyman is one of public concern; that he has a *vested* right in it; that the right to preach is, in itself, property; and that, attached to the office in question, are salary and emoluments. Has the party, in this case, any vested right to the rectorship of Christ Church, and, as a necessary consequence, to the profits and perquisites? No parish can form a part of the diocese of Illinois, unless with the consent of the bishop, and the formation of a constitution, as provided in canon eight, by which it "accedes to, recognizes and adopts the constitution, canons, doctrines, discipline and worship of the protestant episcopal church." The minister, having been previously ordained, and pledged conformity to the rules and doctrines of the. church, is installed as rector, according to canon ten, by the production of the proper certificate from the bishop. The vestry is required, by canon twelve, to obtain the amount stipulated for his support, by "the gathering of offering in divine service, or by the procurement and collection of subscriptions, or of pew rents." It would be a mockery of language, to say that the agreement for a salary thus made

constituted a vested right, a right which could not be suspended. The salary depended upon the continued performance of the duties of rector. The contract must be construed and enforced, by reference to the canons, which form a part of it. If the minister was suspended or deposed, for any ecclesiastical offense, the payment would cease. The case of the *Dutch Church of Albany* v. *Bradford,* 8 Cowen, 457, confirms this view. An action was brought by the minister to recover a portion of his salary. He had been only suspended, and insisted that his salary continued until the dissolution of the connection. In the Court of Errors, on a reversal of the decision of the Supreme Court, it was held that he was not entitled to his salary, between the sentence of suspension and dissolution ; and that, as he did not and could not perform his ministerial duties, he could not recover his salary. The record, in the case at bar, discloses no contract which we can construe, except by reference to the canons.

It is also claimed, that there is value in the right to pursue any lawful avocation. Of this we entertain no doubt. We have no doubt either of the absolute right of every citizen, under our constitution, to teach and preach the gospel, to whomsoever will listen. But in an organized church, with written or printed rules, and established doctrines and mode of worship, the right is qualified. The continuance, power and emoluments of the position, depend upon the will of the church. The right is contingent and restricted, and, as a thing of value, is very much lessened. The sentence of the church judicatory, in a proper case, deprives of the position, and salary and emoluments are gone.

In this unhappy controversy, is involved a graver question, and of deeper moment to all christian men—indeed to all men who believe that christianity, pure and simple, is the fairest system of morals, the firmest prop to our government, the chiefest reliance, in this life and the life to come. Shall we maintain the boundary between Church and State, and let each revolve in its respective sphere, the one undisturbed by

the other ?    All history warns, not to rouse the passion or
wake up the fanaticism, which may grapple with the State, in
a deathly struggle for supremacy.

Our constitution provides, that "the free exercise and
enjoyment of religious profession and worship, without dis-
crimination, shall forever be guaranteed." In ecclesiastical
law, profession means the act of entering into a religious order.
Religious worship consists in the performance of all the
external acts, and the observance of all ordinances and cere-
monies, which are engaged in with the sole and avowed object
of honoring God.   The constitution intended to guarantee,
from all interference by the State, not only each man's religi-
ous faith, but his membership in the church, and the rites and
discipline which might be adopted.   The only exception to
uncontrolled liberty is, that acts of licentiousness shall not be
excused, and practices inconsistent with the peace and safety
of the State, shall not be justified.   Freedom of religious
profession and worship can not be maintained, if the civil
courts trench upon the domain of the church, construe its
canons and rules, dictate its discipline, and regulate its trials.
The larger portion of the christian world has always recog-
nized the truth of the declaration, " A church without disci-
pline must become, if not already, a church without religion."
It is as much a delusion to confer religious liberty without
the right to make and enforce rules and canons, as to create
government with no power to punish offenders.   The consti-
tution guarantees the "free exercise *and* enjoyment."   This
implies, not alone the practice, but the "possession with satis-
faction "—not alone the exercise, but the exercise coupled with
enjoyment.   This "free exercise and enjoyment " must be,
as each man, and each voluntary association of men, may
determine.   The civil power may contribute to the protection,
but can not interfere to destroy or fritter away.

The civil courts will interfere with churches or religious
associations, when rights of property or civil rights are

involved. But they will not revise the decisions of such associations, upon ecclesiastical matters, merely to ascertain their jurisdiction. As we understand the position of the defendant in error, his civil rights are not so endangered as to require our interposition. It may not be improper to collate some of the authorities, which bear upon this question. The controlling principle is declared in the 24th statute of Henry VIII, " Causes spiritual must be judged by judges of the spirituality, and causes temporal by temporal judges." In *Baptist Church* v. *Withenell*, 3 Paige, 296, the Chancellor said : " Over the church as such, the legal tribunals do not profess to have any jurisdiction whatever, except to protect the civil rights of others, and preserve the public peace. All questions relating to the faith and practice of the church, and its members, belong to the church judicatories, to which they have voluntarily subjected themselves." In *Sawyer* v. *Cipperley*, 7 Paige, 281, it is said, " the church, as to its doctrines, government and worship, is to be governed by its peculiar rules." In the case of *Gable* v. *Miller*, 10 Paige, 627, the learned Chancellor doubted the soundness of his former decisions, but his decree was reversed, by the highest court in the State, by a vote of fourteen to three. *Miller* v. *Gable*, 2 Denio, 492.

The same principle is enunciated in *Robertson* v. *Bullions*, 9 Barb., 64, and *Diefendorf* v. *Ref. Cal. Church*, 20 Johns. 12.

In the case of the *German Ref. Church* v. *Seibert*, 3 Barr, 291, it is said : " The decisions of ecclesiastical courts are final, as they are the best judges of what constitutes an offense against the word of God, and the discipline of the church." The court of appeals of Kentucky, in *Shannon* v. *Frost*, 3 Ben. Monroe, 258, says : " This court, having no ecclesiastical jurisdiction, can not revise ordinary acts of church discipline or excision." In a recent case, of *Forbes* v. *Eden*, Cases in House of Lords, 3 Series, Vol. 5, 36, decided in 1867, the Rev. Mr. Forbes alleged, that he could not conscientiously obey certain canons, and that, as a consequence, he might be

degraded from his office of minister, and be deprived of temporal advantages, the Lord Chancellor said: "Appellant does not allege any actual damage, but founds his action upon a possibility of damage hereafter," and that "it was a mere abstract question, involving religious dogmas, and resulting in no civil consequences, which would justify the interposition of a civil court." Lord CRANWORTH said: "There is no authority in the courts to take cognizance of the rules of a voluntary society, * * * save only so far as it may be necessary for the due disposal and administration of property." Lord COLONY said: "A court of law will not interfere with the rules of a voluntary association, unless it is necessary to do so to protect some civil right."

In *Gartin* v. *Penick,* in the Court of Appeals of Kentucky, in 1869, Judge ROBERTSON, who delivered the opinion of the court, said: "Christianity, though an essential element of conservatism, and a great moral power in the State, should only work by love, and inscribe the laws of liberty and light on the heart; and the civil government has no just or lawful power over the conscience, or faith or form of worship, or church creeds or discipline, as long as their fruits neither unhinge civil supremacy, demoralize society, or disturb its peace or security." In reference to church members he said: "They joined the church, with a knowledge of its defined powers, and as the civil power can not interfere in matters of conscience, faith or discipline, they must submit to rebuke or excommunication, however unjust, by their adopted spiritual rulers."

In the only case in this court, in which this question has been adverted to, the court says: "While we will decide nothing affecting the ecclesiastical rights of a church, which we are not competent to do, its civil rights to property are subjects for our examination, to be determined in conformity to the laws of the land, and the principles of equity." *Ferraria* v. *Vasconcellos,* 31 Ill. 25.

There are some authorities in favor of interference, but the cases collated declare the law, as we think it ought to be. We have been referred to numerous cases in Massachusetts. The constitution of that State, from 1780 to 1833, made it the duty of the legislature to " require the several towns, parishes, precincts, and other bodies politic, or religious societies, to make suitable provision, at their own expense, for the institution of the public worship of God, and for the support and maintenance of public protestant teachers of piety, religion and morality, in all cases where such provision shall not be made voluntarily." Const. Mass. Part 1, Art. 3. Laws were passed for the purpose contemplated, and an ecclesiastical law has thus grown up there. These decisions are not applicable in this State, as legislative and judicial interference in such matters is expressly forbidden by the constitution, which all are bound to obey.

This case may, then, be briefly summed up. A rector in the church is charged with nonconformity to its doctrines; intentional omissions in the ministration of its ordinances; and the attempt is made to organize a court, composed of his brother clergymen, for his trial. He appeals to the civil court, and alleges as the chief reason for interposition, the want of authority in the spiritual court to try him, and a misconstruction of the canons. The same point was made to that court, and its power denied. It was urged, with the same earnestness, and enforced with the same arguments there as here. That court overruled the objection, and decided that it had jurisdiction. Five intelligent clergymen of the church, presumed to be deeply versed in biblical and canonical lore, were more competent than this court to decide the peculiar questions raised. Why should we review that, and not every other decision, which involves the interpretation of the canons ? It is conceded that when jurisdiction attaches, the judgment of the church court is conclusive, as to purely ecclesiastical offenses. It should be equally conclusive upon

doubtful and technical questions, involving a criticism of the canons, even though they might comprise jurisdictional facts.

It requires no more intellect, information or honesty, to decide what is an ecclesiastical offense, than to determine the authority of the court, according to the canons. The distinction is without a difference.

Civil courts have duties and responsibilities devolved upon them, and a well defined jurisdiction to maintain. The church has more solemn duties, more weighty responsibilities, and an authority granted by the infinite Author of all things. We shall not enter in, and "light up her temple from unhallowed fire." The ministers selected to sit in judgment on the acts of a brother, ought to be impartial and competent, prompted, as they doubtless are, by the teachings of Divine revelation, and the kindly influences of christian charity, which "suffereth long and is kind; beareth all things, believeth all things, hopeth all things, endureth all things."

Having given this case a most careful consideration, our deliberate judgment is, that the ecclesiastical court ought not to be restrained by the mandate of this court.

It is ordered that the decree of the superior court be reversed, the injunction dissolved, and the bill dismissed.

*Decree reversed.*

Mr. CHIEF JUSTICE LAWRENCE and Mr. JUSTICE SHELDON :

We concur in the decision of the case at bar, announced in the foregoing opinion, and we also concur in the opinion itself, except as to one principle therein. We understand the opinion as implying, that in the administration of ecclesiastical discipline, and where there is no other right of property involved than the loss of the clerical office or salary, as an incident to such discipline, a spiritual court is the exclusive judge of its own jurisdiction, under the laws or canons of the religious association to which it belongs, and its decision of

that question is binding upon secular courts. This is a principle of so grave a character, that, believing it to be erroneous, we are constrained to express our dissent upon the record.

We concede, that when a spiritual court has once been organized, in conformity with the rules of the denomination of which it forms a part, and when it has jurisdiction of the parties and the subject matter, its subsequent action in the administration of spiritual discipline will not be revised by the secular courts. The simple reason is, that the association is purely voluntary, and when a person joins it he consents, that for all spiritual offences, he will be tried by a tribunal organized in conformity with the laws of the society. But he has not consented that he will be tried by one not so organized, and when a clergyman is in danger of being degraded from his office, and losing his salary and means of livelihood by the action of a spiritual court, unlawfully constituted, we are very clearly of opinion he may come to the secular courts for protection. It would be the duty of such courts to examine the question of jurisdiction, without regard to the decision of the spiritual court itself, and if they find such tribunal has been organized in defiance of the laws of the association, and is exercising a merely usurped and arbitrary power, they should furnish such protection as the laws of the land will give. We consider this position clearly sustainable, upon principle and authority.