# SATTERLEE

*v.*

# UNITED STATES EX REL. WILLIAMS.

ECCLESIASTICAL LAW; CERTIORARI.

1. The liability of a clergyman of the Protestant Episcopal Church to indictment and conviction in the civil courts, for offenses charged in an ecclesiastical proceeding against him in a diocesan court, forms no bar to the proceeding in the latter court.

2. The general convention of the Protestant Episcopal Church had the right to make and has the power to enforce, through the proper diocesan court, Canon 2 of Title 2, of the general convention, providing that every minister of the church shall be liable to presentment and trial for certain offenses, including that of crime or immorality, there being nothing in the provisions of the canon violative of or in conflict with the personal ·civil rights of those liable to be tried thereunder.

3. There is no power or jurisdiction in the civil courts of common-law jurisdiction to review and correct, by *certiorari*, supposed errors in the proceedings and judgment of a diocesan court organized under the canons of the general and diocesan conventions of the Protestant Episcopal Church, in matters of ecclesiastical cognizance, such as charges of crime or immorality against a clergyman of the church, but the judgment of such court is conclusive.

4. Because by deposition from his office, a clergyman of the Protestant Episcopal Church as a result of a sentence of a diocesan court, is deprived of the right or power to exercise the functions of a minister of the church, and of the right to earn a salary as such minister, a property right is not thereby involved which will give the civil courts jurisdiction to review by *certiorari* the action of such diocesan court, there being no vested property right in a clergyman to exercise the functions of his office to the end that he may earn and have a salary.

5. Irregularity under the canons of the church in the organization of a diocesan court of the Protestant Episcopal Church; refusal of such a court to entertain a challenge taken by a clergyman on

trial before it to one of the members of the court; supposed insufficiency of the evidence upon which the accused could be convicted, under the provisions of a certain canon, are questions of procedure, where they involve construction of the canons of the church, and depend upon the judgment of the ecclesiastical court, over which the civil courts can exercise no power of revision or control.

No. 1194.  Submitted June 3, 1902.  Decided October 14, 1902.

HEARING on an appeal by the respondent from an order of the Supreme Court of the District of Columbia directing a writ of *certiorari* to issue to bring up for review and correction the records of an ecclesiastical tribunal.

*Reversed.*

The COURT in the opinion stated the case as follows:

This is a special appeal allowed from an order of the court below granting a writ of *certiorari* to the bishop of the Protestant Episcopal Church of the diocese embracing the District of Columbia, requiring him to produce and file in that court what purports to be the record of a proceeding had before a certain ecclesiastical court, organized in and for said diocese, for the trial of a certain matter of charge made and preferred against the relator, a certain Gilbert F. Williams, a priest or clergyman of said church, who was found guilty of the charge and sentenced thereon.

The petition for the writ was in substance demurred to, and was also answered as to matter of fact, by the respondent, the bishop, who is the present appellant; but notwithstanding the objection taken to the power and jurisdiction of the court to take cognizance of the case, the learned justice below, after delivering quite an elaborate opinion upon the case as presented by the petition, concluded by saying, that while he was not perfectly clear as to the power of the court, under the circumstances of the case, to issue the writ of *certiorari* to the bishop of the diocese, yet he thought the manifest demands of justice, as it appeared to him, required that the writ should issue, and he accordingly ordered that

the writ be issued as prayed.    It is from that order that this special appeal was prayed by the bishop and allowed by this court.

It is well known as matter of fact and of church history that the Protestant Episcopal Church in the United States is a regularly organized ecclesiastical establishment, and, like all other religious denominations and organizations of this country, is entirely independent of all State or Federal governmental control, and the membership of which is purely voluntary.    The membership of the ecclesiastical association, according to its constitution and the canons made by its governing body, is divided into what is known respectively as the clergy and the laity, and the supreme governing body of the church is the general convention, composed of representatives of both clergy and laity.    This general convention of the church has general jurisdiction over the affairs of the church and its members, as prescribed in the constitution thereof; and the legislative will of the convention is expressed in the form of canons of the church, changeable from time to time, as the general convention may determine.    Subordinate to this power and general jurisdiction of the general convention, there are subdivisions of the church, known as dioceses, the governing body of each of which is a diocesan convention, presided over by a bishop of the diocese, who is, besides being president of the convention, clothed with certain other powers as the head of the diocese. The laws made by the diocesan convention are also expressed in the form of canons, and they, like the canons of the general convention, are binding upon all members, both clergy and laity, of the particular diocese.    Among the several dioceses of the church in the United States is that of Washington, comprising the District of Columbia and a part of the State of Maryland.

The relator, in his application for the writ of *certiorari,* alleges that he was and still remained a priest or presbyter of said church, up to the year 1897; that he was the rector of Washington parish, in the District of Columbia, up to the year 1897; that he has been deprived of his office of

priest, and of the emoluments thereof, which are of great pecuniary value, by a deposition from the ministry of said church: That the bishop of the diocese, the appellant in this appeal, is in possession and control of the record of proceedings had upon the trial of the relator, whereby the latter was depósed from his said office as priest.

It is then alleged that the canon of the general convention of the church, under which the relator was proceeded against, tried, and convicted, in canon 2 of title 2, entitled " Of offenses for which ministers may be tried and punished;" and that part of the canon which has relation to the present proceeding, is as follows:

" Every minister of this church shall be liable to presentment and trial for the following offenses, viz. :

"(1) Crime or immorality.

"(2) Holding or teaching publicly or privately, and advisedly, any doctrine contrary to that held by the Protestant Episcopal Church in the United States of America.

"(3) Violation of the constitution or canons of the general convention.

"(4) Violation of the constitution or canons of the diocese to which he belongs.

"(5) Any act which involves a breach of his ordination vows.

"(6) And for conduct unbecoming a clergyman of this church.

"And, on being found guilty, he shall be admonished, suspended, or degraded, according to the canons of the diocese, in which the trial takes place, until otherwise provided for by the general convention. * * * And in case of the individual being proceeded against and convicted according to such rules or process as may be provided by the conventions of the respective diocese, he shall be admonished, suspended, or deposed, as the nature of the case may require, in conformity with their respective constitutions and canons."

The canons of the diocesan convention, which have relation to the case, are set out in the petition of the relator for the writ of *certiorari*, and they are Nos. 12, 13, 14, 16, 19,

and 20. These canons provide the mode and form of the proceeding to be instituted against clergymen, and for the trial, and punishment when found guilty. They provide, among other things, for an ecclesiastical court for the diocese of Washington, to be composed of seven presbyters, not members of the standing committee. They are required to be appointed by the president of the convention, by and with the advice of a majority of the diocesan convention, and biennially thereafter, and to continue in office until others shall be chosen in their place, unless sooner removed by a vote of the convention. The bishop, by and with the consent of the majority of the convention, shall have power to fill all vacancies which may occur by such removal, or by death, resignation, removal from the diocese, or election into the episcopate, or standing committee. It is provided by the same canon, that whenever a charge, or charges, against any priest or deacon of the diocese shall have been reduced to writing by the church advocate, agreeably to the provisions of the canons, it shall be his duty to deliver to the bishop two copies of the same duly signed; and thereupon it is made the duty of the bishop to transmit one of said copies to the accused, together with notice of the time and place of trial, — both of which the bishop shall prescribe. The charges and notice are required to be delivered to the accused, or left at his place of abode, at least thirty days before the time fixed for trial. The bishop is also required to issue a precept, directed to all the members of the ecclesiastical court, requiring them, *or any five or more of them,* to proceed to the trial of the accused, at the time and place designated, which precept, together, etc., shall be transmitted by the bishop to the president of the court, whose duty it shall be, upon the receipt of the same, to cause all the members of the court to be summoned to meet at the time and place designated for trial; *and any five of them who shall attend,* in pursuance of such summons, *shall constitute the court.*

By another of the canons recited in the petition, it is provided, that either party to the proceeding shall have the right to summon and examine witnesses at the trial, and to

take depositions to be used at the trial, if necessary; and all testimony is required to be taken under oath; and no accused clergyman shall be convicted of any offense, except upon the oath of two credible witnesses, or upon the oath of one witness, whose testimony is corroborated by pregnant circumstances. Unless a majority of the members of the court, entitled to vote on the final question, of whether the accused is guilty, or not guilty, shall vote that he is guilty, he shall be acquitted; and in no case shall he be found guilty, unless *at least three* members of the court vote for his conviction.

By canon 19, referred to, it is provided that if the accused be found guilty, by a canonical majority of the court, the opinion of the court, together with all their proceedings, including all the testimony taken in the case, shall be transmitted to the bishop, before it is transmitted to the accused, or in any way made public. The court shall also declare to the bishop the punishment, which, in their opinion, the offense deserves; and should the bishop concur in opinion with the court, he may proceed to reprove, suspend, or degrade, as the offense may be thought by him to deserve; *provided, always,* that he shall inflict no punishment beyond that recommended by the court. And by another canon it is provided, that all sentences shall be pronounced by the bishop, and a copy thereof be sent to the accused, etc.; and a sentence of degradation shall be made known in the manner directed by canon 5, section 1, title 2, of the digest of the general convention.

After setting out the canons to which we have referred, the relator then avers in his petition, that there has been no regularly or legally constituted ecclesiastical court for the diocese since the present bishop has been in the exercise of jurisdiction over the same; but there has been what is claimed by the said bishop to be a court, consisting of six members only, and not of seven as required by the canon; and that it was by the court thus constituted of six members, that the relator was tried and convicted.

It is then alleged, that on the first day of January, 1898, there was presented to the six persons supposed to constitute

the ecclesiastical court for said diocese, charges against the relator of acts alleged to involve a breach of his ordination vows, and conduct unbecoming a clergyman of the church, and also of crime and immorality. That the charges made against him, and upon which he was tried and convicted by the said illegally constituted court, were in substance two, namely, *first,* that he took passionate, unchaste, and impure liberties with one of his female parishioners, not, however, involving carnal knowledge of her; and, *second,* that, forcibly and against her will, he committed adultery with the said parishioner, or, in legal effect, committed rape upon her. That to each of the charges and specifications thereof, the relator, before trial, pleaded not guilty, and the trial and conviction were had upon said charges and specifications, and none other; and upon such conviction the bishop, in due form, announced sentence deposing the relator from his office as priest of said church, and depriving him of all benefit and emolument thereto appertaining.

The relator, insisting that the ecclesiastical court was not legally constituted, denies that it had jurisdiction or authority to try him on the charges mentioned, or any of them; and further, that the proceedings of the trial, and the admission of testimony thereat, were contrary to and in defiance of the canons of the church and the law of the land; and that, consequently, the conclusion of the court, and the judgment of the bishop thereon, were and are wholly null, void, and of no effect; whereby the relator was and is wrongfully and unlawfully deprived of his office of priest and the emoluments thereof; and for such wrong he is without remedy by any procedure authorized by the canons of the church.

Wherefore, to the end that the acts, proceedings, and the asserted adjudication, judgment, and sentence, may be reviewed on their merits and the errors thereof corrected, or set aside and declared void, the relator prays that the writ of *certiorari* may issue addressed to the bishop of the diocese, commanding him to certify to this court, under his hand and seal of the diocese, all and singular the actions and proceedings thereupon had, including the testimony taken in rela-

tion thereto, and the conclusions of the supposed ecclesiastical court, and the judgment of the bishop thereon, and all and singular the canons, both general and diocesan, of said church, in relation to the premises involved.

On the petition, and notwithstanding the objection taken to the power and jurisdiction of the court, and the denial of many of the supposed material facts alleged, by the answer of the bishop, the learned court below ordered the writ of *certiorari* to issue *as prayed.*

[The opinion of the lower court, which was delivered by Mr. Justice BRADLEY of that court, was as follows:

" I will dispose of this case at once without holding it under consideration for any length of time, as it has been very fully and ably presented by counsel, and I am clear as to the course which in my opinion ought to be taken.

" The petition is for the writ of *certiorari* to the respondent, who is the Protestant Episcopal bishop of the diocese of Washington and, as such, custodian of the record mentioned in the petition, and which it is sought to have brought before the court for examination. The relator states in substance that he was for many years a clergyman of the Protestant Episcopal Church, first as a deacon and afterwards as a priest or presbyter, and that he was tried by a body calling itself the ecclesiastical court of the church for the diocese of Washington, upon a charge of crime and immorality. His alleged offense, he says, was that he had carnal relations with one of his female parishioners under circumstances amounting in law to rape, and he states that the charge against him was in effect that of rape. He was convicted and deposed from his office, and vainly sought by every means in his power to have what he claims to be the great wrong done him righted within the circles of the church. He has ultimately been led to file this petition for a writ of *certiorari.*

" He alleges that the tribunal by which he was tried was a tribunal that was not organized in conformity to the canons in force in this diocese, in this, that the canons require that

the tribunal should be composed of seven members, to be appointed by the president of the diocese, the appointments to be approved by the convention; that the bishop, instead of appointing seven members of this committee or commission, appointed only six; that two of these appointees declined the office, and the bishop thereupon substituted two others in their place and stead.

" It is alleged that of the members appointed by the bishop and confirmed by the convention was one who was disqualified by reason of the fact that he had formed and expressed an opinion that was adverse to the petitioner some time antecedent to the trial, and the name of the member is given in the petition; that objection was made *in limine* at the trial to this member of the court, it being alleged that he had expressed an opinion that was adverse to the petitioner, and that he was disqualified to sit as a judge in the matter because of prejudice, but that that objection was overruled by the court for want or lack of jurisdiction on their part to pass upon the question.

" It is further alleged that one of the canons of the church in force in this diocese provides that no priest shall be convicted of an offense which will lead to his deposition — I do not pretend to quote the language — except upon the testimony of two credible witnesses, or the testimony of one such witness corroborated by pregnant circumstances; that the main question, which was that of his guilt or innocence of this adulterous act with a member of his congregation, was attempted to be proven solely by the direct testimony of the individual, the female member of his congregation with whom it was alleged that he had this improper relation, and that no other witnesses to that main fact were called for the purpose of corroboration, but that for the purpose of indicating pregnant circumstances two witnesses were called, both females, one of whom testified that three or four years prior to the act with which he was charged and for which he was put on trial he had made some improper suggestion to her, and the other female witness that a year or two later some improper suggestion that was pregnant with meaning (which

is not a "pregnant circumstance") had been made to her. Objection was made to the admissibility and competency of such testimony, but the objection was overruled, the court deeming that such testimony was competent and material and as tending to throw light upon the question that was at issue and on trial.

"I believe that I have enumerated all of the grounds upon which this application is based.

"That a court so constituted, under the canons of the Protestant Episcopal Church, in force in this diocese, was improperly constituted it seems to me to be perfectly plain; that the bishop, as the presiding officer of the diocese and convention, had no power to constitute a tribunal of six members when the canon required seven appears to me to be perfectly plain. If he could have appointed six lawfully he might have appointed three lawfully, and if he could have appointed three lawfully because the convention ratified such appointment, and the convention is the power that made the canons and could change or alter those canons at his own pleasure, then the appointment of three to try such a question as this would have necessitated the result that the canon that requires the concurrence of at least three out of five, the canon that requires that there shall be at least five who shall sit as a judicial body for the trial of such questions would also have been repealed inferentially, because the convention had confirmd the appointment of three. I think that it is perfectly clear that the bishop had no power under the laws governing and controlling his action to constitute a court of six. With a court constituted of seven members, five would constitute a quorum for the purpose of conducting a trial, but to be a lawfully constituted court it should consist of seven members.

"That Mr. Poindexter, a member of this court, was disqualified by reason of prejudice because he had expressed an adverse opinion to the petitioner, taking the statement of the petition as true, also seems to be perfectly manifest. No man should be permitted to sit in judgment upon the rights of another who had prejudged the case. The mere sugges-

tion of it in the recent Schley court of inquiry, where there was not near the amount of direct indication of prejudice as is shown by the statement contained in this petition, was sufficient to justify that court of inquiry in excluding the member to whom objection was made; and it would seem that the ordinary sense of justice, that the ordinary instincts of an educated gentleman would have suggested to this Mr. Poindexter, to whom objection was made because he was prejudiced, to have immediately retired and declined to take any part in the consideration of the case. I am simply assuming the facts to be true as alleged in the petition.

" So as to the main facts, which the canon of the church requires shall be established by the testimony of two credible witnesses or by one credible witness supported or corroborated by pregnant circumstances. That canon was manifestly intended to protect the rights of parties who might be subjected to trial. It is a direct and clear bar that is set up by the laws of the church against the conviction of any man upon insufficient testimony. The canon indicates what is essential, and it provides that no one shall be convicted except upon this essential proof. In the face of such a canon, a conviction of an individual charged with an offense against the church upon testimony that is insufficient under the rules of the church would be manifestly invalid.

" Finally, the other circumstance of the admission of testimony of other acts not of the same character, not for the purpose of proving an intent or motive, but for the purpose of creating an unfavorable impression in the minds of the court against the accused, who was charged with an entirely different and distinct offense, was so manifestly a violation of the right of the petitioner that, if there were nothing else, the court would be compelled, if the record were before it showing such error, to quash the proceeding.

It is urged that the allegations contained in the petition are to a certain extent denied by the answer, but upon such an application the duty of the court is to act simply upon the allegations that are made in the petition, and it must accept those statements of fact as true. The question

whether they are true or not is a question that is to be remitted to and determined by the record when it shall be produced.

" It is urged that the petitioned is not entitled to the consideration of this court because of his laches in bringing the case to the consideration of the court. It should have been done earlier. There seems to be some substance in that suggestion. The ordinary rule, as was indicated yesterday, is that if the party is guilty of such delay as exceeds the limit that is ordinarily placed by statute upon the right of appeal, he has been guilty of such laches as would justify the court in refusing to entertain his petition. Cases were referred to; one that indicated that the lapse of time of a year or a little over; another case that the lapse of time of two years would justify the court in such refusal. But each case depends upon its own circumstances. The question is whether any one is to be prejudiced by the entertainment by the court of the application at the present time. If rights of property or other rights of third persons would be affected by the consideration of the question here, the delay would be a very strong argument against the issuance of the writ. But in this case it does not appear that any one has suffered by the delay except the petitioner, who has been under the ban and cloud of this conviction from the day when it was confirmed by the bishop to the present time. The church has not suffered by the delay. The church, as it appears to me, could not suffer by a reconsideration of this question and a retrial. The church would be substantially benefited, if, upon a retrial, one of its prominent members, who has suffered so long from the effects of conviction of an accusation that is a disgrace to the profession to which he belongs, and a manifest injury to the church, should be shown to be innocent and the victim of circumstances. It would be to the manifest benefit both of the church and of the individual if a new trial could be had and such a new trial should result favorably to the petitioner.

"As I understand it, the question of laches as affecting the right of the court is a question that is addressed to the sound

discretion of the court, and under the circumstances of the case it does not appear to me that the delay that has occurred deprives the petitioner of the right to the consideration of his application by the court.

" Now the question is, and it is the pivotal question on this hearing, whether the writ prayed will lie in a case of this nature.

" This court has the power to issue a common-law writ of *certiorari*.

" The writ will lie to any inferior court, tribunal, or officer exercising judicial or *quasi*-judicial functions and proceeding not according to the course of the common law and where there is no other remedy. The number of different bodies, judicial and *quasi*-judicial, to whom the writ may be addressed, as determined by the courts, is entirely too numerous for me to attempt to mention. It will lie to a subordinate judicial tribunal unquestionably where the right of appeal does not exist. It lies to trustees of public schools who act upon questions submitted to them in a judicial or *quasi*-judicial capacity, to boards of police, to boards of county supervisors, and others of like nature. There can be no reason why it should not lie to an ecclesiastical court unless, as it has been suggested, there is something sacred in the character of that court which would compel a civil court to abstain from interference. That it should not lie to an ecclesiastical court for the purpose of determining whether a question that is purely ecclesiastical in its nature has been properly tried, it appears to me to be clear. But it seems to me that in this case the petitioner has been found guilty, not of an ecclesiastical offense, not of a violation of any of the doctrinal tenets of the religious body to which he belongs, not of a violation of any rule of government or canon of that body, but of an offense against the laws of society, one for which he might have been indicted and prosecuted under the criminal laws in force in this District. If he committed the act with which he was charged and of which he was convicted by this ecclesiastical court, it was not enough that he was tried by that body and deposed from

his office as priest in that church, but some person interested in the well-being of that church and as well interested in the community itself and in the enforcement of its laws and in the protection of its citizens should have seen to it that the machinery of the criminal law was set in motion, in order that petitioner might have been indicted and tried by a criminal court for rape or for adultery.

" Now, the result of this trial is the deprivation to the petitioner of a lucrative office, of a right to practice, possibly, the only profession for which he had been qualified by hard work and study, with the consequent loss of reputation and the deprivation of opportunity, or maybe of obtaining or filling any other place of honor or emolument. It may be claimed that such far-reaching consequences were not contemplated by this ecclesiastical court; that if these consequences have followed, it is not the fault of the court; that the court was simply dealing with him as a priest of the Protestant Episcopal Church, and that its function was simply to determine whether he should continue to fill such office and perform its functions or whether he should be deprived of his office and prevented from exercising its functions further; but the fact remains that the consequences have probably been such as have been intimated. They have been deprivation of reputation, of his means of livelihood, and of the possibilities of making a living otherwise.

" While I am not perfectly clear as to the power of the court under the circumstances of this case to issue a writ of *certiorari* to the bishop of the diocese of Washington, the manifest demands of justice, it appears to me, compel the court to determine this question in favor of the petitioner and to order that the writ issue, and that shall be the order." — REPORTER.]

*Mr. John G. Johnson, Mr. Charles H. Stanley, Mr. R. Ross Perry,* and *Mr. R. Ross Perry, Jr.,* for the appellant.

*Mr. Henry E. Davis* and *Mr. William A. Meloy* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

Upon the facts alleged in the petition of the relator, two principal and controlling questions are presented: *First,* whether the charges upon which the relator was tried and convicted were within ecclesiastical cognizance and jurisdiction, and whether the canon 2, title 2, was made within the proper exercise of the power and jurisdiction of the general convention of the church, having proper regard to the civil personal rights of its members?

*Second.* If such power existed in the general convention, whether, upon conviction of a party under said canon, there is any jurisdiction in the civil or temporal courts of the country to review and correct supposed errors in the proceedings and judgment of the ecclesiastical court; or whether the proceeding and judgment of the ecclesiastical court are not in all respects exclusive of any and all interference of the temporal courts?

1. The church as an organized body of members must have laws and ordinances for the regulation of its existence, and for the preservation of its doctrine and discipline, and also to maintain the purity of its membership. Without such laws and ordinances it would be impossible to maintain discipline and church establishment; and such laws and ordinances have been recognized and enforced from the earliest establishment of the Christian church. The origin of the canon or ecclesiastical law is said to be coeval with the establishment of Christianity, under the apostles and their immediate successors, who are supposed to have framed certain ordinances or canons for the government of the church and its members. These rules or ordinances are called, in the history of the primitive church, the apostolical canons; and though the fact of their being the work of the apostles does not admit of positive proof, yet there is no doubt that they belong to a very early period of ecclesiastical history. They grew and accumulated from the exigencies of the church organization, and became binding upon its members, and in

fact constituted the basis of the modern ecclesiastical law. This is shown in the celebrated opinion of Lord Chief Justice Hardwick, delivered in the case of *Middleton* v. *Croft,* in 1736 (Cas. Temp. Hardwick, 5, 2 Strange, 1056), and reported *in extenso* in the Append. to 2 Atk. 650. In that very learned and celebrated opinion the Lord Chief Justice refers to a manuscript treatise by Lord Chief Justice Hale, wherein the origin of the ecclesiastical law is stated. Lord Hardwick says, " Here rests the sure foundation of all ecclesiastical jurisdiction in this kingdom; and of this a rational and natural account is given in a manuscript treatise of that great and learned judge, Lord Chief Justice Hale, which I have perused: ' I conceive,' says he, ' that when Christianity was first introduced into this island, it came not in without some form of external ecclesiastical discipline (or coercion), though at first it entered into the world without it; but that external discipline could not bind any man to submit to it, but either by force of the supreme civil power, where the governors received it, or by the voluntary submission of the particular persons that did receive it; if the former, then it was the civil power of the kingdom which gave that form of ecclesiastical discipline its life; if the latter, it was but a voluntary pact or submission, which could not give it power longer than the party submitting pleased, and then the king allowed, connived at, and not prohibited it, and thus by degrees,' says my author, ' introduced a custom, whereby it became equal to other customs or civil usages.' "

It was therefore not by the force of statutes, but by the force of custom and usage that the early ecclesiastical law of England had its origin and growth, founded largely upon the constitutions, ordinances, and decrees of provincial synods, held under the early bishops of the English church. 1 Blackst. Com. 82, 83. And it was in this form that the English ecclesiastical law, or such of it as was found to be applicable, was introduced and applied by all the English Christian churches in the English colonies of this country; and that law still remains in force, so far as it is applicable, though by some of the churches it has, to a large extent, been

reduced to the form of canons or ordinances. These, however, where there is any ambiguity or uncertainty of meaning, are always construed in the light of the principles of the ecclesiastical law.

It will be observed that neither in the constitution, or the canons of the general convention of the Protestant Episcopal Church, nor in the canons of the diocese, is there any specification or definition of the particular crimes or offenses for which a clergyman may be tried and punished. By the canon 2, of title 2, of the general convention, to which we have already referred, it is declared that " every minister of the church shall be liable to presentment and trial for crime or immorality;" but of what particular crimes or acts of immorality, the canon leaves it undefined. We must therefore have reference to the general principles and precedents of the ecclesiastical law and the decisions made thereunder, to ascertain for what particular acts and offenses a clergyman may be presented and tried, and, upon conviction, deposed from his office.

The criminal jurisdiction of the ecclesiastical courts of this country is principally confined to offenses against God and religion, and which are not cognizable by the temporal courts. But this is not a universal principle. In many cases both temporal and spiritual courts have concurrent authority. This is so in cases of drunkenness, gross blasphemy, incest, adultery, fornication, solicitation of chastity, all of which are strictly under ecclesiastical cognizance, yet the temporal courts may and do administer punishment for such offenses. Indeed, all open acts of indecency, grossly scandalous, and tending to debauch the manner and moral habits of the people, are cognizable by the ecclesiastical courts. These principles and precedents are established by most unquestionable authority, and are recognized by both civil and ecclesiastical courts. *Caudrey's Case,* 5 Coke Rep. 15, 27–8; 1 Vent. 293; 2 Inst. 622; 3 Inst. 205; 1 Hawk. 7; Salk. 552.

In the opinion of the learned justice below, upon which much reliance is placed by the relator, it is said: " That, in this case, the petitioner has been found guilty, not of an

ecclesiastical offense, not of a violation of any of the doctrinal tenets of the religious body to which he belongs, not of a violation of any rule of government or canon of that body, but of an offense against the laws of society, one for which he might have been indicted and prosecuted under the criminal laws in force in this District." But, manifestly, this is no answer to the charge and presentment made by the church authorities against the relator. Indictment and conviction for the offense under the criminal law in the temporal court would not purify the church of an unworthy member; and, according to all the authorities, to some of which we have referred, liability to an indictment and conviction in the temporal courts, for the offense charged in an ecclesiastical proceeding, forms no bar in the ecclesiastical court. In the celebrated case of *Caudrey,* 5 Coke Rep. 5, where the subject of Ecclesiastical Law is fully and most learnedly discussed by Lord Coke, it appeared by special verdict found, that one C. was deprived for preaching against the common prayer; and it was held, that though there was another punishment appointed by the statute, and not deprivation until the second offense, yet the bishop of London and his colleagues, by virtue of the commission held by them, might proceed by the ecclesiastical law, and deprive him for the first offense; it being against the duty of his office as a minister, and they having power to purge their body of all scandalous members. This principle is nowhere questioned by any well-decided case that has come to our notice.

The object and purpose of the proceeding of the ecclesiastical courts, in cases for crime or immorality, are quite different from that of proceeding and conviction for crime in the temporal courts. Sentences of the ecclesiastical courts in criminal prosecutions, such as the present, consist of spiritual admonition, suspension, or total deposition from office. All the proceedings of these tribunals in criminal causes are professedly *pro salute animœ;* and there is no power of fine or imprisonment. 2 Inst. 492.

It is clear, we think, that the charges against the relator, and upon which he was tried and convicted, are fully within

ecclesiastical cognizance; and that being so, there can be no serious question as to the right and power of the general convention of the church to make and enforce, through the court of the diocese, canon 2, of title 2, of the general convention; it not appearing that there is anything in the provisions of that canon violative of or in conflict with the personal civil rights of the relator, under the law of the land.

2. The second principal question presented, and the one upon which most of the argument at bar was expended, is whether there is any power or jurisdiction in the civil courts, of common-law jurisdiction, by *certiorari*, to require the production to such courts, of the record of proceeding of an ecclesiastical court, for the purpose of revision thereof and the correction of supposed errors therein? This question is of more than ordinary importance, and in regard to which there is some diversity of opinion, though the great preponderance of authority is against the power or jurisdiction of the civil courts to entertain an application such as the present.

In England, where the temporal and ecclesiastical power are greatly more nearly related than in this country, it is only where there is an attempted exercise on the part of the ecclesiastical courts or tribunals of an authority or jurisdiction that does not belong to them, that the civil courts will interpose by prohibition to restrain the spiritual courts from the exercise of illegal or excessive jurisdiction. The temporal courts, however, never interpose by *certiorari*, commanding the certification and production of the record of proceedings of the ecclesiastical court for review; for that would assume the existence of temporal jurisdiction over all ecclesiastical tribunals. This principle is fully exemplified and clearly illustrated by the celebrated case of *The Bishop of St. Davids* v. *Lucy*, 1 Lord Raym., 447 and 539. In that case Lucy instituted proceedings *ex officio* before the archbishop of Canterbury against the bishop of St. Davids upon several articles for simony and other offenses against the canons of the church, the object of the proceeding being to procure a sentence of deprivation against the bishop of St. Davids. The latter answered the articles exhibited against him, and proof

was taken. The respondent denied the right and jurisdiction of the archbishop to take cognizance of the case for the purpose of deprivation. The objection being overruled, the bishop of St. Davids appealed to the delegates; and pending his appeal he applied to the King's Bench for a prohibition, to be directed to the delegates upon divers suggestions, but which prohibition was denied. This application for prohibition was most elaborately and learnedly discussed by counsel for the respective parties; and Chief Justice Holt, in the course of his opinion, said: "Simony is an offense by the canon law, of which the common law does not take notice to punish it. Then it would be very unjust, if ecclesiastical persons might offend against their ecclesiastical duty in such instances, of which the common law cannot take notice to punish them, and yet the King's Bench should prohibit the spiritual court from inflicting punishment according to their law." After the refusal of the prohibition, the appeal was overruled by the delegates, and the archbishop pronounced sentence of deprivation against the bishop of St. Davids, and from which sentence the latter appealed to the commissioner-delegates, they exercising the highest ecclesiastical jurisdiction; and seeing that they were of opinion to affirm the sentence, he again moved the King's Bench for prohibition to be directed to the commissioner-delegates, to stay their proceedings on the appeal from the sentence of the archbishop, upon the suggestion, 1. That by the canon law the archbishop alone could not deprive a bishop; and, 2. That the delegates refused to admit his allegations. But this latter application was also rejected by the King's Bench; and the respondent then obtained, with some difficulty, a writ of error to the House of Lords, on the denial of the prohibition, but it was determined that a writ of error would not lie in such case. These adjudications have been regarded as confirming and settling the exclusive jurisdiction of ecclesiastical tribunals in matters of charge for criminal violation of the canon law.

In this country there have been many decisions upon the question whether the civil courts are concluded in all cases by

the determination or judgment of ecclesiastical courts or tribunals; and, as we have already said, there has not been entire uniformity of decision. But the weight of authority is so strongly preponderant against the right or jurisdiction of the civil courts to review or control the ecclesiastical courts, in matters of ecclesiastical cognizance, that the question can hardly be said to be left open for discussion, and especially not in the Federal jurisdiction, in view of the broad doctrine enunciated by the Supreme Court of the United States, in the case of *Watson* v. *Jones,* 13 Wall. 679.

In that case, it is true, the precise question that is presented here was not involved, and did not require consideration for the decision of that particular case. The subject-matter of controversy in that case was the right to the possession and control of certain church property as between parties of a divided congregation. The question as to the right of property or the execution of a trust, in which the rights of a church may be involved, is, of course, the subject-matter for the exercise of the jurisdiction of the civil courts. But in the case of *Watson* v. *Jones,* in order to determine the rights to the property in controversy, it was deemed necessary to determine the effect that should be allowed to the judgment of certain judicatories of the church as to the *status* or relation of the parties to the church and the property in litigation. It was in this connection that the general principle of the conclusive nature of the jurisdiction of ecclesiastical courts or tribunals was discussed. And it was held, that where the right of property in the civil courts is dependent on the question of doctrine, discipline, ecclesiastical law, rule or custom, or church government, and that has been decided by the highest tribunal within the organization to which it has been carried, the civil courts will accept that decision as conclusive, and be governed by it in its application to the case before it.

The question thus presented was very broadly considered by Mr. Justice Miller, who, apparently, spoke for a minority of the court. The Chief Justice did not sit in the case, and two of the justices who did sit dissented upon the question

of the jurisdiction of the circuit court from which the appeal was taken, and expressed no opinion upon the merits of the case. Some of the language employed by the learned justice delivering the opinion has been criticised, as being too broad and unqualified; but, as we read and understand the opinion, we do not perceive that the criticism is well founded. It has been supposed that it was the intention of the court to lay it down as a settled principle that the spiritual or ecclesiastical court is the *exclusive judge of its own jurisdiction,* under the laws or canons of the religious association to which it belongs, and *its decision of that question is binding upon all secular courts.* But this we think is not a fair construction of the opinion.

In discussing the question of the exclusive jurisdiction of the ecclesiastical courts, the learned justice has reference to cases of proper ecclesiastical cognizance. For instance, he refers to and states the principle decided in the case of *Watkins* v. *Avery,* 2 Bush, 332, wherein it is laid down that when a decision of an ecclesiastical tribunal is set up in the civil courts it is always open to inquiry whether the tribunal acted within the limits of its jurisdiction, and if it did not, its decision could not be accepted as conclusive. After referring to that case and the principle announced by it, Justice Miller proceeds to remark upon the want of precision in the ordinary use of the term "jurisdiction," and says that there is great vagueness often in the use and application of the term. But, by the way of illustration of his meaning of the term, he says, "if the general assembly of the Presbyterian Church should at the instance of one of its members entertain jurisdiction as between him and another member as to their individual rights to property, *the right in no sense depending on ecclesiastical questions,* its decision would be utterly disregarded by any and all civil courts where it might be set up. And it might be said in a certain general sense very justly that it was because the general assembly had no jurisdiction of the case. Illustrations of this character could be multiplied, in which the proposition of the Kentucky court would be strictly applicable.

"But it is a very different thing," says the judge, "where a subject-matter of dispute, strictly and purely ecclesiastical in its character,— a matter over which the civil courts exercise no jurisdiction — a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them,— becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the courts, all of those may be said to be questions of jurisdiction." But, as he proceeds to show, they are not questions of jurisdiction in any proper sense of the term.

The case that has the closest analogy to the present is *Chase* v. *Cheney,* 58 Ill. 509. That was a case instituted in the ecclesiastical tribunal against the respondent for alleged offenses and misconduct as a presbyter, and wherein the accused was liable to be degraded from or deprived of his office. The case is referred to in the opinion of the court, in *Watson* v. *Jones, supra,* and in many other subsequent cases.

In that case the bill was filed to obtain an injunction to enjoin the plaintiffs in error, as an ecclesiastical court, from proceeding with the trial of the defendant for the alleged offenses and misconduct as a presbyter of the diocese of Illinois, and rector of Christ Church, in the city of Chicago.

The bill alleged the issuing of a commission by the bishop of the diocese appointing three persons as presenters, the finding of the presentment, and notice to the accused of the time and place of trial: That when the court was organized, the accused appeared in person and by counsel, and took objections to the validity of all the papers exhibited, but which objections were overruled, and he then claimed the right to challenge the persons selected to try the case, but that also was denied. It was then alleged that the commission, presentment, and citation were all void, and gave no authority to the assessors; that the accused received from his parish

$4,500 per annum, with rectory free of rent, and had received numerous calls from other parishes, at higher salaries; that he had not been guilty of any offense for which he was liable to be tried, but the bishop was prejudiced against him, had prejudged his case, and was determined to convict and deprive him of his position and its emoluments; that the respondents were selected to condemn; that they sympathized with the bishop, and, with him, belonged to the high church party; and that the complainant was attached to the low church party in the Protestant Episcopal Church; and that he and the bishop were diametrically opposed in their views.

There were depositions taken; but it was upon the case as presented in the bill that the decision of the court was founded. It was held: (1) that the fact that the commission issued by the bishop appointing persons to investigate the charges and make presentment, was irregularly issued, did not affect the jurisdiction of the ecclesiastical court; (2) that the ecclesiastical court was the exclusive judge of the sufficiency of the presentment; (3) that such court was not bound by the rules of law as to challenges of jurors; (4) and, where there is no right of property involved, except the clerical office or salary, *the spiritual court was the exclusive judge of its own jurisdiction.*

The court was unanimous in regard to all these propositions except the last; and in regard to that, Mr. Chief Justice Lawrence, and Mr. Justice Sheldon dissented, and they appear to have strong support for that dissent, as to the exclusive right of the court to judge of its own jurisdiction. See the notes by the late Judge Redfield, and Mr. Fuller, the present Chief Justice of the Supreme Court of the United States, appended to the opinion of *Chase* v. *Cheney,* as published in 10 Amer. Law Reg. (N. S.) 295.

It is unnecessary to pursue this subject further, or to cite other authorities. Suffice it to say in conclusion on this question, that where the subject-matter of the judgment or determination of the ecclesiastical court, attempted to be brought under review by a civil court, is of ecclesiastical cognizance, as is the subject-matter of the judgment in this

case, the judgment of the ecclesiastical court is conclusive, and no civil court has jurisdiction or power to revise it, or to question its correctness. To hold otherwise, would be to open the doors of the civil courts and to bring into them, at the election of defeated parties, all charges of the violation of church canons, ordinances, rules of discipline, and for departures from moral standards, instead of having those matters definitively settled within the domain of church government, where, according to established principle and settled policy, they ought to be settled.

There are some other questions of less importance raised in this case, which have been argued at bar, and which we shall now proceed briefly to consider. And the first of these is raised by the contention on the part of the relator, that because he is, by deposition from his office, deprived of the right or power of exercising the function of a minister of the church, and thereby deprived of the right of earning a salary as such minister, therefore a property right is involved, and the civil courts have jurisdiction to protect such right.

The affirmative of this proposition has received the sanction of some judges and of some courts; but we perceive no solid foundation for the contention. It is very true, the civil courts will interfere with churches or religious organizations when the rights of property or the civil personal rights of individuals are involved. But there is no vested property right in a clergyman to exercise the functions of his ministerial office to the end that he may earn and receive a salary for his services. The right to receive the salary is dependent upon the continued performance of his duties as minister; and if he becomes disqualified by suspension or deposition from office, for any ecclesiastical offense, the right to receive the salary will cease as the consequence of the judgment against him. The sentence of the ecclesiastical court, in a proper case, deprives him of his clerical position, and with it all right to future salary and emolument. In the case of *Chase* v. *Cheney, supra,* this question was directly presented, and the right of the complainant denied. In the

case of *Tuigg* v. *Sheehan,* 101 Pa. St. 363, the question
was as to the right of a priest to receive his salary while in a
state of suspension by the bishop; and the Supreme Court of
Pennsylvania disposed of the claim by saying: " The civil
courts wisely decline to interfere in ecclesiastical controver-
sies except where rights of property are concerned. In the
latest case before this court upon this subject it was said:
' The profession of a priest or minister of any denomination
is held subject to its laws; the priest acquires his position
by compact, and is not exempt from the proper discipline
and authority of his church; he has no property in his pro-
fession that shields him from the consequences of his broken
vows and compact.' *Stack* v. *O'Hara,* 98 Pa. St. 213."
The same principle is announced by the Supreme Court of
Tennessee, in the case of *Travers* v. *Abbey,* 104 Tenn. 665;
and many other cases holding the same principle might be
cited, if it were necessary.

It is clear, therefore, there is no question of property right
involved in this case that can give the civil court jurisdic-
tion.

Then, there was an objection raised to the constitution of
the ecclesiastical court that tried the relator, founded upon
the alleged want of conformity to the canon prescribing the
manner of organizing the court. By the canon a diocesan
court is provided for, as we have seen, to be composed of seven
members. It appears that the court that tried the relator was
composed of but six members; but then the precept issued by
the bishop and directed to the members of the court required
them *or any five or more of them* to proceed with the trial.
It is made the duty of the president of the court, upon receipt
of the precept and a copy of the charges, " to cause all the
members of the court to be summoned to meet at the pre-
scribed time and place; and *any five of them who shall at-
tend, in pursuance of such summons, shall constitute the
court.''* . And it is further provided that in no case shall the
accused be found guilty, unless at least three members of the
court vote for his conviction. In this case, the verdict finding
the party guilty was signed by five of the members of the

court; the sixth declining to join in the finding of the accused guilty.

It may be conceded that there was irregularity in the organization of the court; but the question raised in regard to it is simply one of construction of the canon, and was for the ecclesiastical court to determine. Mere irregularity, such as is here complained of, does not justify the interference of the civil court for the purpose of correcting irregularities or errors in the proceeding. The subject-matter of the accusation was, as we have shown, of ecclesiastical cognizance, and the party accused was properly before the court; and such being the case, it was a question for the ecclesiastical court to determine whether the court was, under the canon and by its construction, of competent organization to hear and determine the matter before it. Having so determined, no civil court can review, reverse, or modify that determination. There is no question of jurisdiction of the ecclesiastical court presented, as that question is defined and illustrated by Mr. Justice Miller, in the case of *Watson* v. *Jones,* 13 Wall., pages 679, 732, 733; but only a question of the construction of the canon under which the court was constituted and authorized to act; and that was for the ecclesiastical court to decide.

And so with respect to the question made upon the refusal of the ecclesiastical court to entertain the challenge taken by the relator to one of the members of the court; and the further question urged, that of the supposed insufficiency of the evidence upon which the accused could be convicted, under the provisions of the canon. These were questions of procedure, depending upon the judgment of the ecclesiastical court, over which the civil courts can exercise no power of revision or control whatever. There was evidence of one witness at least, and other circumstances, and whether such evidence gratified the requirement of the canon was for the determination of the ecclesiastical court, and not the civil court. The principle that applies to such questions is well stated in the case of *Walker* v. *Wainwright,* 16 Barb. 486, cited and quoted from by the court in the case of *Chase* v.

*Cheney, supra.* In that case, kindred questions to those presented here were urged as ground for interference by the civil court. It was an application for an injunction to restrain the bishop from the enforcement of a sentence in accordance with the verdict of an ecclesiastical court. The learned judge who delivered the opinion, said: " The only cognizance which the court will take of the case, is to inquire whether there is a want of jurisdiction in the defendant to do the act which is sought to be restrained. I cannot consent to review the exercise of any discretion on his part, or inquire whether his judgment, or that of the subordinate ecclesiastical tribunal, can be justified by the truth of the case. I cannot draw to myself the duty of revising their action, or of canvassing its manner or foundation, any further than to inquire whether, according to the law of the association to which both of the parties belong, they had authority to act at all. In other words, I can inquire only, whether the defendant has the power to act, and not whether he is acting rightly. * * * The refusal of the defendant to issue a commission to take testimony, his refusal to grant a new trial, the alleged misconduct of one of the court, are all matters which relate to the mode of procedure, and not to the right to proceed; and I repeat that it is the latter alone that I can take cognizance of."

The case being one of more than ordinary importance, we have given it most careful consideration, and our conclusion is, that the petition of the relator presents no ground for the interposition of a civil court, by the issuance of a writ of *certiorari,* to have the record of proceedings of the ecclesiastical court brought before it for review. We must therefore reverse the order appealed from, and remand the cause, with direction to the court below to dismiss the petition of the relator; and it is so ordered.

*Order reversed, cause remanded, with direction to dismiss the petition.*